# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF KENTUCKY
# LOUISVILLE DIVISION

**CIVIL ACTION NO. 10-432-C**

**ROGER BENTLEY,**                                                                          **PLAINTIFF,**

**V.**                 **MEMORANDUM OPINION AND ORDER**

**LIBERTY MUTUAL ASSURANCE
CO. OF BOSTON,**                                                           **DEFENDANT.**

\* \* \* \* \* \* \* \* \* \*

Pending before the court is Roger Bentley's motion for judgment on the merits. R. 13. Bentley is appealing an ERISA administrator's decision denying him long-term disability benefits. For the reasons discussed below, Bentley's motion will be denied.

### I. Facts

Bentley was formerly a jeweler for Amazon Corp. LLC. In this position, Bentley was required to assemble and finish custom jewelry, including inspecting and sizing stones and performing basic mountings. He was also required to pack and ship customer orders. At Amazon, Bentley was covered under a disability insurance plan administered by Liberty Mutual Assurance. The plan offered both short-term disability (STD) and long-term disability (LTD) benefits to qualifying employees.

Bentley initially applied for STD on or about July 13, 2009, and was granted

STD benefits on August 17, 2009. His stated bases for seeking disability benefits were depression, panic attacks, chest pains, and a rapid heart beat. In subsequent communications, Bentley's conditions were described as leg pain, venous insufficiency, chronic obstructive pulmonary disorder (COPD), coronary artery disease, major depressive disorder, generalized anxiety disorder, and panic attacks. Liberty eventually terminated his benefits on December 3, 2009.

During this period, Bentley's primary treating physician was Dr. Mark Orgel. On August 11, 2009, Liberty received an FMLA form filled out by Dr. Orgel, in which Dr. Orgel stated that Bentley had major depressive disorder, generalized anxiety disorder, and panic attacks. Although Dr. Orgel apparently recommended that Bentley see a therapist, Bentley indicated to Liberty that he first wanted to see whether medication would work.[1] Dr. Orgel also indicated that Bentley would need to miss work from July 10 to August 9, that he would need quarterly office visits, and that he might occasionally have flare-ups. On August 17, 2009, Liberty approved Bentley's STD claim beginning July 11, 2009 through September 17, 2009. Liberty also advised Bentley that if he was not able to return to work on September 17, he would need to submit additional medical information. On September 11, 2009, Liberty received another form filled out by Dr. Orgel. Orgel again diagnosed Bentley with depression and panic disorder. Orgel also noted that Bentley had been subsequently diagnosed with coronary artery disease and chronic

---

[1]There is no evidence that Bentley ever visited a therapist for his depression.

obstructive asthma. Orgel extended Bentley's estimated return-to-work date to October 27, 2009. On October 26, Liberty received another form from Dr. Orgel. Orgel diagnosed Bentley with COPD - acute exacerbation and mononucleosis, and revised his expected return-to-work date to January 4, 2010. On October 30, Liberty advised Bentley that it would need additional documentation if he wished to extend his disability benefits beyond November 29, and requested that he provide full medical records. In response, Bentley requested that Dr. Haradon, a cardiologist; Dr. Haller, a pulmonologist; and Dr. Bergamini, a vascular specialist, release his treatment records to Liberty.

Dr. Haradon's records indicated that Bentley received an angioplasty on August 13, 2009. Haradon gave a primary diagnosis of coronary artery disease and secondary diagnoses of PTCA and COPD. Haradon estimated that Bentley could return to work on January 15, 2010. On October 13, Bentley saw Dr. Tu, another cardiologist in Haradon's group. Tu noted that Bentley was doing very well and had no recurrent angina. An echocardiogram indicated normal heart function and structure.

Bentley first saw Dr. Haller on October 2, 2009. During this visit, Haller diagnosed Bentley with acute exacerbation of COPD and noted that it "sounds like a viral syndrome as a trigger." On October 19, 2009, Haller noted that Bentley had been hospitalized for mononucleosis. Haller provided a pulmonary function diagnosis of minimal obstructive airway disease-peripheral airway and scheduled a

3

follow-up visit in three months.

Bentley first saw Bergamini on July 6, 2009. During this visit, Bentley was asked an array of questions about his health. Bentley denied being unhappy or anxious or having poor concentration. Bentley also noted that his asthma and bronchitis were controlled with inhalers. Bergamini found venous insufficiency in Bentley's right lower leg, for which he prescribed compression stockings and recommended a follow-up visit in two months.

After receiving Bentley's medical records, Liberty forwarded Bentley's file to a Nurse Case Manager ("NCM") for review. NCM Linda Mavrolas conducted this review on or about December 9, 2009. AR 103. Mavrolas found that Bentley's primary diagnosis was coronary artery disease, complicated by COPD. However, she noted that pulmonary testing indicated minimal obstruction and that Bentley's coronary artery disease had been treated with stents. Further, Bentley's cardiologist had found that Bentley was not considered a risk for heart attack. Mavrolas acknowledged that Bentley had been diagnosed with venous insufficiency in his right leg, but she pointed out that Bentley was using compression stockings and not scheduled for follow-up treatment for another four months. She also noted that Bentley's hypertension was considered stable and under control. Last, she found that the diagnosis of depression was not supported. In conclusion, she determined that there was no basis to support any ongoing restrictions or limitations.

Bentley remained on STD until December 23, 2009, when Liberty advised

4

him that he was no longer eligible for STD benefits. Because Bentley failed to satisfy the LTD 180-day elimination period, he was advised that he failed to qualify for LTD benefits as well. In its letter, Liberty detailed its rationale for denying his benefits. AR 151-54. It stated that although Bentley had coronary artery disease, he was doing well and there were no restrictions associated with this condition. Further, although Bentley had been diagnosed with COPD, asthma, and bronchitis, these conditions were mild and not impairing. Nor did it find any restrictions associated with his hypertension or venous insufficiency. Last, it stated that there were no records supporting Orgel's diagnosis of depression, nor any records of symptoms associated with depression. Given these findings, combined with the requirements of Bentley's job as a jeweler, Liberty concluded that Bentley was able to perform his duties at Amazon. Bentley appealed this determination on January 8, 2010.

In support of his appeal, Bentley submitted additional medical records. These records included notes from visits to Dr. Orgel that were not previously disclosed. On one such visit, Orgel indicated that Bentley had had less than one panic attack per week over the past three weeks. Three other visits concerned urticaria (a skin rash) and hives. Bentley also submitted a form letter completed by Dr. Orgel on January 7, 2010, in which Orgel indicated there was no reasonable possibility that Bentley could return to work before July 13, 2010. Dr. Orgel did not provide (and the form did not request) any explanation for this conclusion. Another form

provided was completed by Orgel on January 4, 2010, and indicated that Bentley would need frequent physician follow-up for his conditions. Bentley also submitted records from a visit to Dr. Haller, the pulmonologist, on January 18, 2010. According to these records, Bentley had run out of his bronchodialator medication over the weekend, and had had considerable difficulty breathing. Haller found that Bentley had "severe obstruction with significant bronchodialator response." Haller listed no work restrictions and told Bentley to return to his office for a follow-up in six to eight weeks.

Bentley's supplemental records were also reviewed by NCM Mavrolas. Mavrolas again found that Bentley had asthma, COPD, and coronary artery disease, aggravated by his "long-standing smoking history." The records also showed complaints of nasal congestion, swollen ankles, muscle and joint pain, heartburn, constipation, shortness of breath, chest discomfort, wheezing, dizziness, anxiety, and depression. However, Mavrolas noted that Bentley's oxygen saturation rates were good, that his lungs were clear when treated with inhalers, and that his current treatment plan involved medication, smoking cessation, and a follow-up in six to eight weeks. There were no documented restrictions or limitations associated with Bentley's coronary artery disease. Given these findings, Mavrolas concluded that restrictions "of less than sedentary are not supported."

Bentley's records were then sent to the Appeals Review Unit for a peer review. This review was conducted by Dr. Leonard Cosmo, a board certified

physician in internal medicine, critical care medicine and pulmonology. AR 112-16. Dr. Cosmo first outlined the medical records he reviewed in creating his report. He also described multiple unsuccessful attempts to contact Drs. Orgel and Haller.

Dr. Cosmo concluded that there was no objective medical documentation of any significant functional impairments supporting a finding of disability. Specifically, Dr, Cosmo noted that Bentley's respiratory problems were under control with inhaled bronchodialators and steroids and that there was no evidence of any decompensated cardiac failure or unstable angina. Consequently, Dr. Cosmo found that "sitting, standing, walking, lifting, carrying, reaching, and repetitive and fine motor hand motions would not be restricted."

On March 23, 2010, Liberty informed Bentley that it was upholding its previous denial of disability benefits. AR 107-09. Liberty outlined Bentley's stated bases for seeking disability (depression, panic disorder, and chronic obstructive asthma), the physical requirements of his job as a jeweler, and the medical evidence in the record. Liberty concluded that "[a]lthough you may continue to experience some symptoms, the medical information contained in your file does not support complications severe enough to preclude you from performing the material and substantial duties of your own job."

### II. Analysis

Liberty did not act arbitrarily or capriciously in denying Bentley disability benefits. Notwithstanding the limited scope of Dr. Cosmo's review, there was

7

sufficient evidence in the record to support Liberty's decision, particularly since Bentley marshals little evidence that he actually meets the plan's definition of disability.

Under the STD plan, "disability" is defined as an employee being "unable to perform the material and substantial duties of his own job." Hence, the inquiry here is whether Bentley can perform the functions of a Technical Support Tech/Jeweler (i.e., set, arrange, and inspect stones; package and mail shipments, etc.). Given the totality of the evidence, there is sufficient evidence to support Liberty's finding that he can perform these functions.

Bentley makes several arguments for finding that Liberty denied his disability benefits in contravention of ERISA. First, Bentley argues that Liberty's decision should be reviewed under a *de novo* standard of review. Second, Bentley argues that Liberty's decision should be overturned because the physician who conducted the peer review never physically examined him, because Liberty has a conflict of interest, and because Liberty never performed a functional capacity evaluation. Third, Bentley notes that Liberty initially granted his application for STD benefits, yet there is no evidence that Bentley's health improved thereafter. Fourth, he argues that Liberty in general, and Dr. Cosmo in particular, ignored certain "mitigating" factors and that they ignored other evidence of disability. Both separately and in combination, these arguments fail to demonstrate a sound basis for finding that Liberty erred in denying Bentley's claim.

First, Liberty's decision must be reviewed under the "arbitrary and capricious" standard. The question is whether the plan gave the administrator discretion to determine eligibility. *Smith v. Ameritech*, 129 F.3d 857, 863 (6th Cir. 1997). If it did, then this court is bound to review its determination under the arbitrary and capricious standard. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989). Because the plan in question gave Liberty such discretion, its decision can be overturned only if it was arbitrary and capricious.

Second, the fact that Dr. Cosmo never physically examined Bentley is not a sufficient basis for overturning Liberty's decision to deny benefits.[2] "Paper reviews" are permissible. *See, e.g., Evans v. UnumProvident Corp.*, 434 F.3d 866 (6th Cir. 2006); *Calvert v. Firstar Finance, Inc.*, 409 F.3d 286 (6th Cir. 2005). As with many other aspects of an ERISA decision, the administrator's decision to rely on a paper review is "just one more factor to consider in [the] overall assessment of whether [it] acted in an arbitrary and capricious fashion." *Calvert*, 409 F.3d at 295. Similarly, although Liberty is potentially operating under a conflict of interest, this does not mandate a different standard of review, nor does it independently dictate a contrary result. Such a conflict of interest is merely another factor to be weighed in determining whether an administrator acted arbitrarily or capriciously.

---

[2]Bentley also accuses Dr. Cosmo of being biased against him. R. 13 at 10 (stating that Dr. Cosmo's findings were a "foregone conclusion" and that they were "jaundiced by the money he was paid"). However, he provides no evidence to support such claims. *See Kalish v. Liberty Mutual*, 419 F.3d 501, 508 (6th Cir. 2005) (indicating that conclusory allegations of bias are insufficient).

*See, e.g., Calvert*, 409 F.3d at 292; *Marks v. Newcourt Credit Group, Inc.*, 342 F.3d 444 (6th Cir. 2003).

Furthermore, Liberty's failure to perform a functional capacity exam (FCE) is not dispositive. Bentley provides no caselaw indicating that an FCE is mandatory, nor does he indicate where the policy in question mandates such an examination. In any case, in his analysis, Dr. Cosmo specifically mentioned the skills required for Bentley's position and described why he believed Bentley could perform them. AR 115. Hence, some of the considerations in an FCE were included in Cosmo's analysis.

Third, Liberty's initial decision to approve Bentley's application for STD benefits is not binding in the way that Bentley suggests. Bentley emphasizes that he was initially found "disabled" within the meaning of the STD plan on August 17, 2009. He then notes that no doctor has documented any improvement in his condition since that time. He argues that he must, therefore, still be disabled under the terms of the plan. The problem with this argument is that there is no such presumption of disability. As Liberty repeatedly told Bentley, he was required to provide updated records in order to qualify for continuing benefits.[3] Bentley mistakenly assumes that the initial finding of disability was intended to last in perpetuity, despite the clear language to the contrary.

---

[3]The necessity of providing additional evidence of disability is underscored by the fact that Dr. Orgel initially stated that Bentley would need to miss only a few weeks of work. It was not until Bentley's benefits were denied that Orgel suggested that he would need to miss work for an extended period.

Last, although the scope of Dr. Cosmo's review was narrow, the record indicates that Liberty examined all of Bentley's complaints prior to denying his benefits. As stated in his review, Dr. Cosmo was assessing Bentley's condition from a "pulmonologist and internal medicine perspective," and his review appears to be limited to these areas. Bentley claims that Dr. Cosmo ignored the plaintiff's depression and its impact in combination with the plaintiff's other conditions on his ability to perform his job functions. However, Bentley points to no cases that indicate an independent medical examiner must analyze each and every claimed illness or ailment. The case primarily relied on by Bentley, *Kalish v. Liberty Mutual*, held that when an administrator "relied exclusively on the independent file review of [the IME] in making its determination," the IME's report must address the claimant's doctors' contrary medical conclusions and any other contradictory evidence. 419 F. 3d 501, 510. Here, Liberty did not rely exclusively on Dr. Cosmo's report. It also relied on the findings of NCM Mavrolas, who found no support for a diagnosis of depression. Although Dr. Cosmo did not address Bentley's claimed depression, this does not mean that Liberty never analyzed it, nor does it mean that Dr. Cosmo's review was insufficient.

Furthermore, the record contains very little evidence that Bentley has depression. The only physician to suggest that Bentley suffered from depression was Dr. Orgel; however, outside of referring Bentley to a therapist (whom Bentley never actually saw), Orgel made no attempt to describe Bentley's symptoms or

11

otherwise provide support for his diagnosis. NCM Mavrolas stated in her initial review on December 9, 2009, that "based on review of the medical records reviewed; depression is not supported." In its letter to Bentley denying his benefits, Liberty informed him that "there are no records to support the diagnosis of depression or that you are having symptoms related to this diagnosis." Bentley was told of Liberty's finding and was free to supplement his records and, in fact, did provide records from later trips to Dr. Orgel and Dr. Haller; but Bentley chose not to provide any records contradicting Mavrolas's conclusion that he did not have depression.

This is not a case where an independent medical examiner willfully excluded portions of a claimant's medical history or provided an insufficient basis for his findings. *See Calvert*, 409 F.3d 286, 296. Dr. Cosmo stated the scope of the review he was undertaking, adequately summarized the data he considered, and described why there was insufficient evidence to support the conclusion that the claimant could not perform the functions of his job. Nor is this a case where the administrator fails to account for a vast discrepancy in findings between the claimant's doctors and the independent examiner. With the exception of Orgel's diagnosis of depression, his other diagnoses were all confirmed by Mavrolas and Cosmo. The only discrepancy lies in the way they characterize the impact of Bentley's health problems on his ability to work.

Despite Bentley's suggestions to the contrary, Dr. Orgel is the only physician

12

to suggest that he cannot work. Bentley claims that it is "undisputed that Drs. Orgel, Haller, and Bergamini and other of Plaintiff's treating physicians consider him to be disabled or chart conditions that are disabling." He also claims that "[t]hree treating physicians state that he cannot work in any occupation because he must lie down to work and concentrate." However, the only doctor who has reached this conclusion is Dr. Orgel. Indeed, throughout his memorandum, Bentley ascribes to various physicians statements that appear to be completely unfounded. *See* R. 13 at 3 (claiming that four of Bentley's physicians "opine that he is unable to engage in full time employment"). The other physicians never indicated that they believed Bentley to be disabled, and his treatment record suggests the opposite. Dr. Bergamini, the vascular specialist, treated Bentley's venous insufficiency on July 6, 2009. He prescribed compression stockings and requested a return visit in two months. At his second visit on September 3, 2009, Dr. Bergamini noted Bentley's continued venous insufficiency, and requested that he return in four months. Nowhere did he suggest that Bentley could not work. Dr. Haller saw Bentley on October 2, October 19, and January 18. The records from these visits do not indicate that Haller considered Bentley to be disabled. The only other physician who indicated that Bentley's ability to work was limited was Dr. Haradon. Following Bentley's angioplasty, Dr. Haradon found his functional capacity to be severely limited. However, he also estimated that Bentley could return to work on January 15, 2010; and during a follow-up visit with another cardiologist on October 3,

Bentley was found to be doing "very well" with normal heart function and structure.

In contrast to Bentley's claims, it is Dr. Orgel's findings that are undersupported. Dr. Orgel initially estimated that Bentley would need to be off work from July 10 to August 9, 2009, and that he would need to schedule quarterly office visits. He later extended this date to August 31, then October 27, then January 4. Finally, on January 4, Dr. Orgel extended his return-to-work date to "indefinite" and indicated that he would need frequent physician follow-up. On January 7, Dr. Orgel stated that there was no reasonable probability that Bentley could return to work by July 13, 2010. Nowhere does Orgel explain the discrepancy between his initial prognosis that Bentley might miss a few weeks of work and need quarterly office visits and his later opinion that he was completely disabled and would need frequent follow-up. This change is particularly noteworthy given that it conflicts with the findings of Bentley's cardiologist, pulmonologist and vascular specialist.

The only support for Bentley's claim of depression is the diagnosis of Dr. Orgel, his primary care physician. Nowhere does Orgel describe the basis for this diagnosis or the course of treatment undertaken. Dr. Orgel did refer Bentley to a therapist; however, as described earlier, Bentley never actually went to see her. Consequently, there are no relevant records outside of the statements of Bentley's family practice physician. Given this paucity of evidence, it was not arbitrary and

capricious for Liberty to conclude that Bentley's diagnosis of depression was not supported.

In sum, Liberty did not violate ERISA by denying Bentley's disability benefits. Because the plan gave it discretion to determine eligibility, its decision need only be "rational in light of the plan's provisions." *Smith v. Ameritech*, 129 F.3d 857, 863 (6th Cir. 1997) (*quoting Daniel v. Eaton Corp.*, 839 F.2d 263, 267 (6th Cir.1988)). Although Liberty's potential conflict of interest and Dr. Cosmo's failure to physically examine Bentley must be considered, together they do not show that Liberty acted irrationally. Bentley simply provided insufficient evidence of a disability as defined by the plan. He did not support Dr. Orgel's diagnosis of depression, and the conditions he did support were found to be disabling only by Dr. Orgel, not the specialists. For all these reasons, Liberty did not act arbitrarily or capriciously.

### III. Conclusion

**IT IS ORDERED** that Roger Bentley's motion for judgment on the merits, R. 13, is **DENIED**.

Signed on May 2, 2011

**Jennifer B. Coffman, Judge**
**United States District Court**

15